James Corey HINES, Appellant

v.

The STATE of Texas, State.

No. 2–03–236–CR.

Court of Appeals of Texas,
Fort Worth.

July 1, 2004.

David Wacker, Denton, for Appellant.

Bruce Isaacks, Crim. Dist. Atty., Kathleen Walsh, Catherine Luft, Lori Moraine and Earl Dobson, Asst. Dist. Attys., Denton, for State.

PANEL A: CAYCE, C.J.; GARDNER and McCOY, JJ.

## OPINION

ANNE GARDNER, Justice.

On appeal, Appellant James Corey Hines raises two points alleging ineffective assistance of counsel during various stages of his punishment trial. We will affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On November 21, 2002, nineteen-year-old Appellant was charged by indictment with one count of indecency with a child—his thirteen-year-old half-sister, L.H.—for touching her breast and genitals on July 8, 2002. He was also charged with three counts of aggravated sexual assault: (1) for intentionally or knowingly causing his sexual organ to contact L.H.'s anus on July 22, 2002; (2) for intentionally or knowingly causing his sexual organ to contact L.H.'s sexual organ on September 1, 2002; and (3) for intentionally or knowingly causing his sexual organ to contact L.H.'s anus on September 23, 2002. After being admonished and apprised of his rights, Appellant signed a judicial confession admitting that he had committed the offenses for which he was being charged, pleaded guilty to all four offenses, and decided that a jury would assess his punishment.

On June 16 and 17, 2003, the State presented evidence before a jury concerning Appellant's punishment. Upon consideration of all of the evidence and testimony presented, the jury assessed punishment at two years' confinement, probation rec-

ommended, for the indecency with a child count and fifteen years' confinement for each of the three aggravated sexual assault counts. The trial court then signed a judgment on Appellant's guilty pleas, ordering Appellant to serve the three fifteen-year sentences concurrently and ordering Appellant's two-year sentence probated for ten years, to run consecutively to the other three sentences.

Subsequently, the trial court granted Appellant's trial counsel's motion to withdraw and appointed new appellate counsel. On July 18, 2003, Appellant filed a verified motion for new trial on the grounds that his plea was not voluntary, he received ineffective assistance of counsel, and the best interest of justice required a new trial. The trial court conducted a hearing on Appellant's motion for new trial on August 28, 2003, at which Appellant's trial counsel testified to his trial strategy. After considering all of the testimony and evidence presented, the trial court denied Appellant's motion for new trial.

## II. POINTS

In two points, Appellant contends that he was denied his right to effective assistance of counsel during his trial on punishment.[1] In his first point, Appellant argues that trial counsel rendered ineffective assistance in six areas that were also addressed during the hearing on his motion for new trial: (1) counsel's decision not to introduce military discharge records; (2) counsel's questioning of a sex abuse therapist who testified on behalf of Appellant; (3) counsel's decision not to call G.H., the father of both Appellant and the victim; (4) counsel's decision not to introduce a videotape that included some of L.H.'s statements; (5) counsel's failure to object during the State's closing argument; and

(6) counsel's decision not to call as a witness the interrogating officer who took Appellant's confession. In his second point, Appellant asserts that trial counsel also rendered ineffective assistance in failing to conduct any meaningful voir dire of the venire panel assembled for the punishment phase. We will address each point in turn.

## III. LAW OF INEFFECTIVE ASSISTANCE OF COUNSEL

■ The Sixth Amendment to the United States Constitution affords criminal defendants the right to reasonably effective assistance of counsel. U.S. CONST. amend. VI; *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003); *Garcia v. State,* 57 S.W.3d 436, 440 (Tex.Crim.App. 2001), *cert. denied,* 537 U.S. 1195, 123 S.Ct. 1351, 154 L.Ed.2d 1030 (2003). We apply a two-pronged test to ineffective assistance of counsel claims, including challenges concerning counsel's assistance at punishment. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Thompson v. State,* 9 S.W.3d 808, 812 (Tex.Crim.App.1999); *Hernandez v. State,* 988 S.W.2d 770, 770 (Tex.Crim. App.1999).

■ First, Appellant must show that his counsel's performance was deficient. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. In evaluating the effectiveness of counsel under the first prong, we look to the totality of the representation and the particular circumstances of each case. *Thompson,* 9 S.W.3d at 813. The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065.

1. We observe that, while Appellant challenged the voluntariness of his plea in his motion for new trial, he does not renew this argument on appeal.

■ "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690, 104 S.Ct. at 2066. Our scrutiny of counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689, 104 S.Ct. at 2065. When the record is silent as to possible trial strategies undertaken by defense counsel, we will not speculate on the reasons for those strategies. *See Jackson v. State,* 877 S.W.2d 768, 771 (Tex.Crim.App.1994). Thus, the record must be sufficiently developed to overcome the strong presumption that counsel provided reasonable assistance. *Bone v. State,* 77 S.W.3d 828, 833 n. 13 (Tex.Crim.App.2002) (citing *Thompson,* 9 S.W.3d at 813–14).

■ Second, Appellant must show that the deficient performance prejudiced the defense. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. The second prong of *Strickland* requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial, i.e., a trial whose result is reliable. *Id.* at 687, 104 S.Ct. at 2064. In other words, Appellant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The ultimate focus of our inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *Id.* at 697, 104 S.Ct. at 2070.

## IV. ISSUES ADDRESSED DURING THE MOTION FOR NEW TRIAL HEARING

■ Appellant's first point concerns six alleged deficiencies that were raised and addressed by his trial counsel during the hearing on his motion for new trial. In his brief, Appellant acknowledges that trial counsel was given the opportunity to explain his trial strategy with respect to each of the challenged decisions, but he maintains that counsel's performance was nevertheless deficient. We disagree.

### A. NOT INTRODUCING APPELLANT'S MILITARY DISCHARGE RECORDS

Appellant contends that trial counsel's performance was deficient because he failed to introduce military discharge records that would have shown Appellant was emotionally delayed. At the hearing on the motion for new trial, however, trial counsel explained that he did not introduce the military discharge records because they showed a diagnosis of impulse control disorder and Appellant's history of anger problems that he did not want to make known to the jury. Indeed, the discharge records indicate, among other things, that Appellant "was evaluated for anger problem[s] and hearing voices" and had been diagnosed with "impulse control disorder." Counsel explained he did not want the jury to believe that Appellant had no control over himself or was "sick"; rather, he wanted the jury to believe that Appellant made a "stupid mistake" with his half-sister. Therefore, counsel testified that he called witnesses who would demonstrate through testing and their expertise that Appellant had "a low probability of doing this again" so that the jury would be inclined to recommend probation and treatment.

### B. QUESTIONING OF A SEX ABUSE THERAPIST

Appellant also complains that counsel's assistance was constitutionally infirm because he failed to thoroughly question Emily Elfurd, a sex abuse therapist who testified on Appellant's behalf. Specifically, Appellant contends that counsel never ex-

plored with Elfurd the availability of various types of treatment in prison or the fact that no treatment was available until the last eighteen months of incarceration. Further, Appellant points out that counsel never elicited testimony from Elfurd that "Appellant did not exhibit the characteristics of a classic pedophile."

Counsel testified that he did not want to call an expert to the stand who would be able to say what was wrong with Appellant; rather, he "just wanted her to be able to say, yeah, . . . he's not terrible. He's good for counseling. . . . He will probably be okay if he can get counseling while he's on probation." Moreover, counsel stated that he did not want the jury to concentrate on the possibility of treatment in prison; instead, he wanted the jury to think that Appellant could get treatment from a variety of available places outside of prison.

Counsel further testified that he did not question Elfurd about Appellant's not being a pedophile because he feared the State would call a rebuttal expert witness who "would probably have testified to something different." Counsel explained that after his insanity defense "washed out," he did not want to show Appellant as having impulse control disorder but wanted to portray Appellant as "a kid who had a hormonal problem, . . . fell in love with his sister, and had sex with [her]." Additionally, counsel did not want the judge or the prosecutors to think that Appellant was sick because he was trying to avoid having Appellant's sentences run consecutively.

## C. Not Calling G.H. as a Witness

Next, Appellant argues that his counsel rendered ineffective assistance by failing to call G.H., the father of both Appellant and L.H., as a witness. During the hearing on Appellant's motion for new trial, Appellant called G.H., who testified that he was never contacted by Appellant's trial counsel and that "[he] would like to have seen [Appellant] get probation." But G.H. further testified, "Being the father of both the victim . . . and the Defendant, it was hard to weigh whose interest I had to look out for most." On cross-examination, G.H. acknowledged that he had served as a police officer for twenty-three years and understood the seriousness of Appellant's crime, which is a first degree felony. When G.H. was asked, "And you understand that when people commit crimes like that, . . . there is a punishment that needs to be paid? Isn't that correct," he responded, "Yes, ma'am."

Trial counsel stated that he never contacted G.H. to testify on behalf of Appellant because he thought it was too risky to put someone like G.H. on the stand. Counsel also stated, however, that he had prepared to cross-examine G.H. in the event that the State called him to testify. Counsel reasoned, "[I]n a situation like this that was pretty volatile, I couldn't trust him to get on the witness stand and be a good witness for his son when it was his daughter who was molested by his son." Further, counsel testified that G.H. did not indicate that he cared about Appellant because he had not gone to the police station with him and had not maintained any contact with Appellant during the time Appellant was charged and tried. In fact, Appellant's mother testified at trial that G.H. had already turned his back on Appellant, but she offered her assurances to the jury that she had been and would continue to support him regardless of whether Appellant got probation, which she thought would be more beneficial to Appellant than sending him to the penitentiary.

## D. Not Introducing a Videotape of L.H.'s Statements

Appellant further argues that he received ineffective assistance when his trial counsel did not introduce a videotape that allegedly contained a recitation from L.H. that the sexual abuse occurred less frequently than she described at trial. During the hearing on Appellant's motion for new trial, Appellant did not offer the videotape to compare it to L.H.'s trial testimony or to demonstrate what testimony should have been offered to the jury. Instead, Appellant merely questioned his trial counsel about why he did not show the videotape, which he alleged could have been used to impeach L.H.'s testimony regarding the frequency of the sexual assaults.

Counsel agreed that he asked few questions of L.H., but he testified that he did not want to hurt Appellant by attacking L.H. or by keeping her on the stand any longer than was necessary. Counsel testified that L.H. "was a very good little witness," and he did not want to "hack[ ] off the jury" by accusing her of being a liar. Counsel stated that because Appellant had admitted to the allegations contained in the indictment and had pleaded guilty to all four offenses, "I didn't see any point in saying, aha, he did it only four times and not seven." According to counsel, "The bottom line on the video was that she said he did it," and because Appellant admitted that he committed the sexual offenses, counsel saw no "reason to have yet another piece of evidence brought down here against him."

### E. Failing to Object to the State's Closing Argument

In addition, Appellant alleges that trial counsel acted ineffectively when he did not object to the State's labeling Appellant a "predator" during closing argument. Counsel gave the following explanation for his decision not to object:

In ... a case like this, unless ... the statement in the final argument by the prosecution is so bad that it is going to call for a reversal, I don't jump up and object to it and call attention to it. I let it go. I let it slide. And then I make my argument, pointing to their argument and ... scoffing at it, that he is not a predator, he's not a monster, he is ... a kid that made a mistake. If ... sometimes when you object to ... the statements, all you are doing is demonstrating that you really believe that that is what this person is or you call attention to it. And I don't do that unless it is bad enough that ... there would be a reversal, and sometimes not even then depending on what kind of jury I think I have.

Appellant then asked counsel whether he thought it was even questionable in his mind as to whether the State's argument was improper. Counsel responded, "I ... may have objected to it if I thought it would have made a good record or something. But at the time, I ... didn't care because I didn't think it was that bad[,] and I didn't want to call attention to it."

### F. Not Calling Appellant's Interrogating Officer as a Witness

Finally, Appellant asserts that trial counsel's assistance was constitutionally deficient because he did not call as a witness Corey Cook, who was the interrogating officer that obtained Appellant's confession. Appellant's trial counsel agreed that he was aware that a recording of Appellant's interrogation revealed that Officer Cook had told Appellant "words to the effect that he would try to help him out[,] or he thought he needed counseling or probation or something like that." Appellant followed up, asking counsel why he had not called Officer Cook to testify to help mitigate Appellant's punishment.

Counsel explained that he thought Officer Cook's statements were "part of his interrogation technique to get [Appellant] to open up and confess to the offenses." Counsel stated that he would never call a police officer to testify on behalf of a defendant because, in terms of trial strategy, "you cannot trust them" as they "normally ... don't help you." From counsel's past experiences, he said, "I have seen that a hundred times in the videotapes of interrogations, ... [but] he was not going to come in here and testify that [Appellant] needed to have probation or counseling or whatever."

Appellant then asked counsel whether it made any difference that Officer Cook was a friend of Appellant's father, Appellant, and the victim. While acknowledging that they were all friends, counsel testified to his belief that their friendship would not have made a difference and stated, "[I]t's never been my experience ever that a police officer has been called by the defense and actually helped the defense ever." Additionally, counsel testified that while Officer Cook was in the hall during trial, despite "pass[ing] each other quite a few times, ... [h]e never indicated to me that he would testify on [Appellant's] behalf."

Appellant's trial counsel stated that his "whole strategy in the trial ... was to say that [Appellant] stood up and took responsibility for his actions and confessed to the police and ... jury and, therefore, the jury ought to cut him some slack." Counsel stated that he was worried that if Officer Cook testified, Appellant's videotaped statement to the police would have "come screaming into evidence," which would have shown that Appellant "did not really take responsibility like we said he did." Counsel testified that, while he was "glad" the State did not call Officer Cook, had the State done so, he was prepared to cross-examine the officer.

## G. OUR ANALYSIS OF THE SIX ALLEGED DEFICIENCIES

In his brief, Appellant points to the six alleged deficiencies and recites trial counsel's explanations for the decisions he made, but Appellant offers no counter-arguments whatsoever demonstrating how or why trial counsel's assistance was constitutionally infirm. In accordance with precedent from the Texas Court of Criminal Appeals, we have previously stated that a criminal defendant is not entitled to errorless or perfect counsel. *Mayo v. State,* 17 S.W.3d 291, 300 (Tex.App.-Fort Worth 2000, pet. ref'd) (citing *Ewing v. State,* 549 S.W.2d 392, 395 (Tex.Crim.App. 1977), *overruled on other grounds, Hurley v. State,* 606 S.W.2d 887, 890 (Tex.Crim. App. [Panel Op.] 1980)). Rather, we are to examine whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error, giving great deference to trial counsel's strategy and professional judgment. *See Strickland,* 466 U.S. at 688–89, 104 S.Ct. at 2065.

We have carefully examined the arguments as detailed above, the evidence offered, and the explanations given by trial counsel at the hearing on Appellant's motion for new trial as to the allegations of ineffective assistance of counsel. Based on the totality of the representation and the particular circumstances of this case, we conclude that the record does not reveal deficient performance by Appellant's trial counsel sufficient to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See id.,* 466 U.S. at 687, 104 S.Ct. at 2064; *Bone,* 77 S.W.3d at 833 n. 13; *Thompson,* 9 S.W.3d at 813–14. Accordingly, we overrule Appellant's first point.

## V. Voir Dire

■ Appellant's second point is that he received ineffective assistance of counsel because his trial counsel asked no meaningful questions during voir dire. Although Appellant did not raise this issue in the proceedings concerning his request for a new trial, he may raise this point for the first time on appeal.[2] *See Robinson v. State,* 16 S.W.3d 808, 809–11 (Tex.Crim. App.2000) (stating that a defendant does not waive an ineffective assistance claim by failing to raise it first at trial or in a motion for new trial). The State responds that, in light of the information it gleaned during its voir dire, it was unnecessary for Appellant's trial counsel to revisit many of the issues covered or to conduct a more extensive voir dire. Thus, the State argues that Appellant's trial counsel's conduct was not deficient under the first *Strickland* prong. *See Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064; *Thompson,* 9 S.W.3d at 813.

Appellant points out that the reporter's record shows that the State's questioning of the veniremembers spans seventy-six pages, while Appellant's counsel's questioning covers just over eight pages. Appellant argues that trial counsel failed to conduct a meaningful voir dire and characterized counsel's actions as "chatting briefly with the jury panel" and inadequately questioning the panel. He states, "there is no trial strategy that permits counsel to stand mute during voir dire." Appellant does not challenge trial counsel's use of

peremptory strikes or the challenges for cause he used, with the State's agreement, to remove the thirteen veniremembers who said they could not consider probation.

Appellant directs us to a case in which the Texarkana Court of Appeals held that the appellant's trial counsel's failure to conduct a meaningful voir dire and his use of two peremptory strikes on veniremembers previously excused by the court constituted ineffective assistance, requiring a reversal of the conviction and a remand for a new trial. *Goodspeed v. State,* 120 S.W.3d 408, 413 (Tex.App.-Texarkana 2003, pet. granted).[3] At the outset, we respectfully acknowledge that as a court of equal jurisdiction to that of the Texarkana court, we are not bound by *Goodspeed. See Cannon v. State,* 691 S.W.2d 664, 679–80 (Tex.Crim.App.1985) ("[C]ourts are not bound by decision of other courts of equal jurisdiction. The power to establish precedent is lodged in courts of superior jurisdiction."), *cert. denied,* 474 U.S. 1110, 106 S.Ct. 897, 88 L.Ed.2d 931 (1986).

Even were we to follow *Goodspeed,* which we decline to do, we read *Goodspeed* as being factually distinguishable from the case before us now. In *Goodspeed,* neither the State nor defense counsel questioned the veniremembers about whether they could consider the full range of punishment, including community supervision, in the context of a sexual assault case. *Goodspeed,* 120 S.W.3d at 411–12. In contrast, the State in the case before us told

---

2. We construe Appellant's argument as a challenge to the adequacy of trial counsel's voir dire and not as a complaint that trial counsel wholly failed to participate in voir dire. *Cf. Miles v. State,* 644 S.W.2d 23, 24 (Tex.App.-El Paso 1982, no pet.) (holding that counsel rendered ineffective assistance by, among other actions, "not ask[ing] the jury a single question on voir dire").

3. The court of criminal appeals granted the State's petition for discretionary review on the following issue: "In finding trial counsel ineffective solely upon his conduct during voir dire, the court of appeals misapplied and altered the two-pronged standard for evaluating a claim of ineffective assistance of counsel." *Goodspeed v. State,* No. 03–1882 (Tex.Crim. App. Feb. 18, 2004).

the veniremembers that, with respect to punishment, they "need[ed] people [who could] keep an open mind to the fact that they might hear evidence on either end of the spectrum." The State then informed the veniremembers of the punishment range and again told the panel that "to sit on a jury, they have to keep an open mind to the fact that there is a situation out there where they could consider ... the idea of giving probation to a person that they thought really deserved it."

Appellant argues that the State used a flawed hypothetical as it began its questioning of the veniremembers about whether they could consider probation. He points to the portion of the State's voir dire during which the State informed the jury that in special situations, a defendant could be deserving of probation. The State illustrated saying, "when we are talking about probation, we are talking about a minimum situation. I mean, the absolute ... minimal case, the perfect person ... that is out there and the least offensive way that the offense can be committed." As the State continued asking the veniremembers whether they could consider the full range of punishment, including probation, the State continued its discussion and questioning about whether probation might be appropriate:

> But to be able to sit on a jury, you have to be able to keep an open mind at this point. I mean, once you start thinking about facts and ... hearing what is going on, then ... at that point, ... you don't have to start at probation.... [Y]ou don't have to start at life in the penitentiary. But you just have to be open minded to the fact that there might be a situation out there—and it may not be ... this case or this person, just there might be a case out there that you would hear the facts where you would keep an open mind and, if you really were convinced that the evidence was

there and convinced you this is a really good person that just made ... a terrible slip-up and ... I think that probation would benefit both that person and society and ... getting treatment—at this point could there be a case out there that if you—if the facts allowed it and the law allowed it and justified it, would you be able to give it?

We disagree that the phrasing of the State's hypothetical precluded the State from determining if prospective jurors had a bias or prejudice against considering probation as a minimum sentence. The thrust of the State's explanatory information, hypotheticals, and questions was to suggest that there might be circumstances when probation is warranted and to determine whether any of the veniremembers could not keep an open mind to the full range of punishment regardless of what the facts and evidence showed. *See Sadler v. State,* 977 S.W.2d 140, 142 (Tex.Crim.App.1998) ("[Jurors] must be able, in a sense, to conceive both of a situation in which the minimum penalty would be appropriate and of a situation in which the maximum penalty would be appropriate.") (citation omitted). While Appellant complains on appeal that the State's questioning was inadequate for Appellant to determine juror bias and prejudice toward probation, and that his trial counsel should have objected to the State's flawed hypothetical, a careful reading of the record reveals that the State was ferreting out bias and prejudice toward any consideration of probation and provided sufficient information for Appellant to make challenges for cause and peremptory strikes.

Ultimately, the State questioned the forty-five veniremembers about whether they would be unable to consider giving probation to Appellant. Thirteen people stated that they could not consider giving proba-

tion. When Appellant's counsel examined the panel, he stated that he was not going to go over the same issue of whether the veniremembers could consider the full range of punishment. *See, e.g., Smith v. State,* 968 S.W.2d 490, 494 (Tex.App.-Texarkana 1998, no pet.) (stating that because the State "accurately informed and then questioned the venire about their ability to consider the entire range of punishment, ... there was no need for counsel to re-ask the same questions").

Instead, counsel said he would only ask one question of the thirty-two veniremembers who said they could consider probation: whether they could be fair to both sides. Each one responded affirmatively to his question. With the State's agreement, defense counsel then requested that the thirteen veniremembers who stated that they could not consider probation be stricken for cause. Both sides then exercised their peremptory strikes, and there is no evidence that Appellant's trial counsel "wasted" any of his peremptory strikes. *See Goodspeed,* 120 S.W.3d at 413 (stating that Goodspeed's attorney "wasted two peremptory strikes," which further required the court to find his performance deficient).

In the case at bar, the record does not reveal the reasons or strategy for trial counsel's actions during voir dire because ineffectiveness of counsel on that ground was not raised in Appellant's motion for new trial, and we will not speculate on the reasons for counsel's trial performance. *See Jackson,* 877 S.W.2d at 771. Thus, Appellant's complaints on appeal regarding his trial counsel's manner of conducting voir dire concern actions that may or may not be grounded in sound trial strategy, but the record is silent as to counsel's reasons for proceeding as he did. We will not "reverse a conviction on ineffective assistance of counsel grounds when counsel's actions or omissions may have been based upon tactical decisions, but the record contains no specific explanation for counsel's decisions." *Bone,* 77 S.W.3d at 830; *see also Diaz v. State,* 110 S.W.3d 181, 185 (Tex.App.-San Antonio 2003, pet. ref'd); *Patterson v. State,* 46 S.W.3d 294, 306 (Tex.App.-Fort Worth 2001, no pet.). Accordingly, we overrule Appellant's second point.[4]

## VI. CONCLUSION

Having overruled both of Appellant's points, we affirm the trial court's judgment.

---

4. This issue is better raised via an application for a writ of habeas corpus. TEX.CODE CRIM. PROC. ANN. art. 11.07 (Vernon Supp.2004); *Rylander v. State,* 101 S.W.3d 107, 110 (Tex. Crim.App.2003) ("[T]he record on direct appeal will generally not be sufficient to show that counsel's representation was so deficient as to meet the first part of the *Strickland* standard as [t]he reasonableness of counsel's choices often involves facts that do not appear in the appellate record.") (internal quotations omitted).